## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ———————————— | : |  |
| AMERIPRISE FINANCIAL SERVICES, | : |  |
| INC., | : |  |
|  | : | Civil Action No. |
| Plaintiff, | : | 11-6140-NLH-JS |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| PAUL KOENIG, | : |  |
|  | : |  |
| Defendant. | : |  |
| ———————————— | : |  |

**<u>Appearances</u>:**

JAMES EATON HEAVEY
THOMAS B. LEWIS
STARK & STARK PC
P.O. BOX 5315
PRINCETON, NJ 08543
*Attorney for plaintiff*

THOMAS PATRICK KELLY , III
KELLY LAW OFFICES LCC
3000 ATRIUM WAY
SUITE 291
MOUNT LAUREL, NJ 08054
*Attorney for defendant*

**<u>HILLMAN, District Judge</u>**

      This matter comes before the Court upon plaintiff's motion for a temporary restraining order ("TRO") seeking the return of plaintiff's proprietary client information.  Also before the Court is defendant's "cross motion" for summary judgment.  For reasons explained below, plaintiff's motion will be granted in part and denied in part, and defendant's "cross motion" will be denied.

I.   **BACKGROUND**

Plaintiff, Ameriprise Financial Services, Inc. ("Ameriprise") offers financial services such as financial planning, investment advice and management, securities brokerage, counseling and business services.  Defendant Paul Koenig is designated as a certified financial planner by the Board of Standards, Denver, Colorado, and was employed with Ameriprise as a financial advisor.  As a financial advisor for Ameriprise, Koenig had access to various kinds of confidential and proprietary information including client lists, contact information, financial information and new client prospects.

Both parties do not dispute that in August 2004 many firms in the financial industry adopted what is referred to as "The Protocol for Broker Recruiting" ("Protocol").  The Protocol provides:

> The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms.  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "[raiding]". ...

> When RRs move from [one] firm to another and both firms are signatories to this protocol, they may take

2

only the following account information[:] client name,
address, phone number, email address, and account title
of the clients that they serviced while at the firm
("the Client Information") and are prohibited from
taking any other documents or information.
Resignations will be in writing delivered to local
branch management and shall include a copy of the
Client Information that the RR is taking with him or
her.  The RR list delivered to the branch must also
include the account numbers for the clients serviced by
the RR.

     ...

RRs that comply with this protocol would be free
to solicit customers that they serviced while at their
former firms, but only after they have joined their new
firms.  A firm would continue to be free to enforce
whatever contractual, statutory or common law
restrictions exist on the solicitation of customers to
move their accounts by a departing RR before he or she
has left the firm.

Barney v. Burrow, 558 F.Supp.2d 1066, 1073-74 (E.D.Cal. 2008).

Thus, under the Protocol, a financial representative
leaving one Protocol company to join another should prepare two
lists, one that he retains containing client names, addresses,
phone numbers, email addresses, and account titles of the clients
that he serviced while employed at the company, and another
containing the same information, plus the account numbers for the
clients, that is to be given to the company he is leaving.  If a
representative complies with this Protocol, he may solicit those
clients, after he has joined his new firm, despite contrary terms
contained in his employment agreement.

When Koenig began his employment with Ameriprise on
April 25, 2007 he signed a financial advisor agreement ("FA

3

agreement") in which he agreed not to reveal certain confidential information stored by Ameriprise.  On September 1, 2011, Ameriprise terminated Koenig's employment for "insubordination in failing to attend a mandatory meeting."  On September 2, 2011, Koenig states that he attempted to resign pursuant to the terms of the Protocol, and prepared two spreadsheets, one to keep containing the client information permitted under the Protocol, and one to submit to Ameriprise containing the same client information plus account numbers.  Ameriprise did not accept the Protocol spreadsheet from Koenig at that time.[1]

Ameriprise states that after Koenig's attempted resignation, they reviewed and inspected Koenig's office and found seven client paper files missing.[2]  Ameriprise also states

---

[1]    The Protocol spreadsheet containing the account numbers was returned to counsel for Ameriprise at or shortly following the TRO hearing.

[2]    Originally, plaintiff alleged six files were missing, but it appears the correct number is seven.  Regardless of the number of allegedly missing files, Koenig states that he did not remove them and that the files are missing due to Ameriprise's own mismanagement.  Koenig offers that for three of the seven files, the last name is the client's maiden name and it is likely that the file is under the client's current married name.  Koenig states that one of the files was a client of another advisor, and that he has no recollection of the names of the remaining three files.  In light of Defendant's surreptitious removal of electronic files, his rather remarkable lack of recall during his deposition, and other acts of apparent disloyalty to his former employer, we are not satisfied that Koenig did not remove paper files.  We are equally convinced, however, that plaintiff has not firmly established that a removal of paper files occurred.  Accordingly, we will not specifically order the return of the those materials.  The Defendant is on notice, however, that the

that it conducted a preliminary forensic examination of Koenig's computer and determined that Koenig had deleted client contact information and client meeting information from Ameriprise's client contact management database, Contact Manager.

After leaving Ameriprise, Koenig began employment with Integrated Financial Partners ("IFP"), a competitor of Ameriprise.  On September 14, 2011, attorneys for Ameriprise sent Koenig a letter demanding the return of all Ameriprise files and client information removed by Koenig.  Ameriprise states that Koenig responded that he did not have the requested information.

On September 19, 2011, Ameriprise filed a "Uniform Termination Notice for Securities Industry Registration" or "U-5" Form with the Financial Industry Regulatory Authority ("FINRA").  On the U-5 Form, Ameriprise responded "no" to a question on the form asking whether Koenig was currently under internal review for fraud or wrongful taking of property.  The U-5 form was verified by Alanna Proctor, an Ameriprise employee responsible for compliance, licensing and registration at Ameriprise.

On October 18, 2011, Ameriprise filed a complaint

---

the removal of such files would have been a violation of both the Protocol and the FA Agreement.  Such materials, if they exist, are encompassed within the confidential materials the Defendant must return to the Plaintiff in Order to comply with this Opinion and accompanying Order.  In light of Defendant's removal of a substantial amount of confidential materials via email, we reject his argument that the lack of evidence that he removed paper files renders Plaintiff's application for injunctive relief moot.

against Koenig for breach of contract, tortious interference with contract, misappropriation of trade secrets, and unfair competition.  Ameriprise also filed a motion for a TRO against Koenig, and provided notice of the motion to Koenig the same day. Upon agreement of the parties, a hearing was held on October 20, 2011.  Decision on the TRO was reserved pending a deposition of Koenig to resolve disputes of fact underlying the TRO application.

Following the TRO hearing, on October 26, 2011, Karen L. Odash, Senior Manager of Legal Affairs for Ameriprise, states in an affidavit that she accessed Koenig's Ameriprise email account and reviewed 616 emails dated from August 15, 2011 to September 3, 2011.  Odash states that on August 29, 2011, Koenig received two internal Ameriprise compliance emails stating that the "email monitoring system detected certain unsecured sensitive information (e.g., social security number, account number, credit card number, etc.) contained in an email or attachment you [Koenig] sent on 08/26/2011."  The recipient of both emails was "writepauli@yahoo.com" which is Koenig's personal email address. Ameriprise states that the two emails contained drafts of clients' financial plans for the "G[redacted]d case" and the "K[redacted]i case".  Ameriprise states that Koenig's Ameriprise client group list identified those clients as serviced by Koenig while at Ameriprise.

Odash then states that from August 15, 2011 through August 31, 2011, 54 emails were sent to "writepauli@yahoo.com", 30 of which contained Ameriprise client confidential information. In particular, Odash states that on August 26, 2011, 23 emails were sent from Koenig's Ameriprise email address to "writepauli@yahoo.com", 15 of which contained attachments with Ameriprise client financial plans or confidential or proprietary information, and 8 of which contained Ameriprise client information in the body of the email itself.

Pursuant to Court Order, Koenig was deposed on October 28, 2011, and testified that he had been searching for other employment for at least a year and half prior to his termination from Ameriprise.  Koenig testified that in the middle of August 2011, he received an offer letter from IFP, and accepted employment with IFP as a financial advisor sometime between August 15th and September 1st.[3]  When asked the reason why on August 26, 2011 he forwarded to his personal email address financial plans prepared for approximately eleven Ameriprise clients that he serviced, Koenig responded that he could not recall.  Koenig admitted that in the weeks leading up to his leaving Ameriprise he postponed meetings with Ameriprise clients to a time after he left Ameriprise.  Koenig also admitted that he "possibly" deleted client information out of Ameriprise's Contact

---

[3]     Koenig testified that he did not recall the exact date that he accepted employment with IFP.

7

Manager database.[4]

Before the Court is Ameriprise's motion for a TRO and Koenig's "cross motion" for summary judgment.  Ameriprise's motion will be granted in part and denied in part, and Koenig's "cross motion" will be denied.

## II.  **JURISDICTION**

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).  Plaintiff is a corporation organized under the laws of the State of Delaware and has its principal place of business in Minnesota.  Defendant is an individual and citizen of the state of New Jersey.  Plaintiff alleges that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## III.  **DISCUSSION**

### Standard for Issuance of an Injunction or Restraining Order

Although Ameriprise initially filed a motion seeking a temporary restraining order ("TRO"), both parties have filed briefs and limited discovery has been conducted.  Therefore, the Court will convert the motion from a TRO application to a motion

---

[4]    In another remarkable lapse in memory, the Defendant can not recall and offers no explanation as to why he would delete then-current contact information for a client from Ameriprise's electronic files.  A reasonable supposition is that Defendant sought to sabotage or frustrate any attempts Ameriprise might make to contact his former clients when he finally announced his departure.

for a preliminary injunction.  <u>See</u> Fed.R.Civ.P. 65.  The standard

for issuance of a TRO or injunctive relief is the same.  <u>See</u>

<u>Singer Management Consultants, Inc. v. Milgram</u>, 650 F.3d 223, 236

n.4 (3d Cir. 2011) (addressing temporary restraining orders and

preliminary injunctions together, "as the two share nearly

identical factors which courts evaluate in granting such interim

relief and, in certain circumstances, have identical legal

effect.") (citing <u>Miller v. Mitchell</u>, 598 F.3d 139, 145 (3d Cir.

2010).  The difference is that a TRO may be issued with little or

no notice and may dissolve on its own accord.  <u>Id.</u>; Fed.R.Civ. P.

65(b) (permitting court to issue a TRO without written or oral

notice to the adverse party provided certain conditions are met).

A party seeking a preliminary injunction has the burden

to prove each of the following four elements: (1) a likelihood of

success on the merits; (2) that it will suffer irreparable harm

if the injunction is denied; (3) that granting preliminary relief

will not result in even greater harm to the nonmoving party; and

(4) that the public interest favors such relief.  <u>Bimbo Bakeries</u>

<u>USA, Inc. v. Botticella</u>, 613 F.3d 102, 109 (3d Cir. 2010); <u>Child</u>

<u>Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.</u>,

386 F.3d 514, 524 (3d Cir. 2004).

### Ameriprise's Motion for Injunctive Relief

Ameriprise seeks injunctive relief on its claims for

breach of contract and misappropriation of trade secrets.  It

does not seek relief on its claims for tortious interference with contract or unfair competition.  Koenig argues that Ameriprise's motion should be denied because it was Ameriprise, not he, who violated the terms of the Protocol.[5]  Koenig also argues that much of the injunctive relief requested by Ameriprise is moot since Koenig has returned the Protocol spreadsheet and is not in possession of any information beyond that permitted by the Protocol.

For reasons explained below, Ameriprise has shown a likelihood of success on the merits of its contract claim and will be awarded injunctive relief.

### (1)   Likelihood of Success on the Merits

### (a) Breach of Contract

Ameriprise argues that Koenig signed a valid FA agreement on April 25, 2007 containing a strict confidentiality provision, and that Koenig breached the agreement and misappropriated trade secrets when he removed confidential and proprietary client information from Ameriprise.  Ameriprise states Koenig forwarded confidential and proprietary client information, including client financial plans, to his personal email address prior to his resignation.  Ameriprise also states

---

[5]      Koenig also argues that Ameriprise had made defamatory and untrue statements about him in a letter to his new employer. Koenig has not filed a counterclaim against Ameriprise and, therefore, any purported defamation claim is not properly before this Court.

that Koenig contacted clients and cancelled meetings with Ameriprise clients prior to his resignation.

Koenig responds that he attempted to provide Ameriprise with the Protocol spreadsheet containing client names, addresses, phone numbers, email addresses, account titles and account numbers of the clients Koenig serviced.  Ameriprise refused to take the spreadsheet from Koenig and purposefully allowed him to leave with the information.  Koenig argues that since he followed the terms under the Protocol and attempted to provide Ameriprise with a Protocol spreadsheet, he is permitted to retain the client information and solicit clients notwithstanding the terms of the FA Agreement.  Koenig argues that Ameriprise's refusal to accept the spreadsheet and subsequent legal action against him violates the Protocol.  Koenig also argues that Ameriprise's claim that Koenig deleted client information preventing Ameriprise from servicing those clients is specious because Ameriprise submitted an affidavit of Salvatore Petetti, filed on the Court's docket and made available to the public, which contained confidential client information.[6]

Although Koenig is correct that Ameriprise should not be able to thwart a financial representative's efforts to follow the Protocol by refusing to accept the required list of client information and account numbers upon resignation, that is not the

---

[6]     The confidential information has since been filed under seal.

11

situation here.  Based on the facts in the record, Koenig violated the Protocol before he attempted to resign. Specifically, Koenig forwarded protected client information for several clients, including financial plans prepared at Ameriprise for Ameriprise clients he serviced, to his personal email address on August 26, 2011.  When asked specifically why he sent those emails to his personal email address in the course of three minutes, on a Friday night, approximately one week before he attempted to resign, Koenig simply could not recall.  Koenig also could not recall contacting three Ameriprise clients he serviced on the evening of August 24, 2011to "discuss important changes" to his practice.

Nowhere in the Protocol does it permit a financial representative to forward confidential client information such as financial plans to a private email address prior to resigning as long as the representative later prepares the appropriate Protocol client lists.  In fact, the Protocol specifically outlines exactly what information the representative may leave with upon resignation.  Koenig's actions suggest that he took client information from Ameriprise in violation of the Protocol and then sought to use the formal procedures of the Protocol in order to avoid the non-compete and confidentiality provisions in his FA Agreement.  Such actions go against the terms and spirit

of the Protocol.[7]

Accordingly, Ameriprise has provided sufficient uncontested facts that show that by emailing financial plans of several former Ameriprise clients to his private email address, Koenig removed confidential "excess information" in violation of the FA Agreement.[8]  Ameriprise, therefore, is likely to prevail

---

[7]      We recognize that Ameriprise chose to allow Koenig to leave with the client list containing the account numbers upon his termination.  Accordingly, we do not rely on that event in awarding injunctive relief.  However, neither the FA Agreement nor the Protocol permit Koenig to retain client account numbers even if had been in compliance with the Protocol.  We are at a loss to understand why one in breach should be able to retain this confidential information.  While Koenig, through counsel, has subsequently returned the protocol list with account numbers to Ameriprise, left unresolved is an apparent third list defendant admitted to in his deposition.  To the extent that Koenig has any other list of any kind, or other documents containing those account numbers, such information must be removed from his files, both electronic or otherwise, and any tangible copies returned to Ameriprise.  Any copies or other form of that information in the hands of third parties, electronic or otherwise, who received it from Koenig or as a result of his misconduct, must also be returned and none of the information retained or utilized by such third parties.  Secondly, certain confidential client information was made public when Ameriprise filed the Affidavit of Salvatore Petetti on the Court's docket.  Although Ameriprise cannot hold Koenig liable for information that it made public, such information is confidential and has since been filed under seal.  Therefore, to the extent that Koenig has retained any confidential information briefly made public, such information must be removed from his files and, if necessary to insure full compliance with the Order accompanying this Opinion, returned to Ameriprise.

[8]      Ameriprise argues that the confidentiality provisions in the FA Agreement are enforceable.  Under New Jersey law, a restrictive covenant in an employment contract can be enforceable if it: (1) protects a legitimate interest of the employer; (2) imposes no undue hardship on the employee; and (3) is not injurious to the public.  See Solari Industries, Inc. v. Malady, 264 A.2d 53, 56 (N.J. 1970).  "Even if the covenant is found

on its breach of contract claim.

### (b) Misappropriation of Trade Secrets

With regard to its claim for misappropriation of trade secrets, Ameriprise argues that the information removed by Koenig before he was terminated amounts to trade secrets. To prevail on a claim for misappropriation of trade secrets under New Jersey law, a party must establish: "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff."   Merckle GmbH v. Johnson & Johnson,

---

enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity." Coskey's Television & Radio Sales and Service, Inc. v. Foti, 253 602 A.2d 789, 793 (N.J.Super.A.D. 1992). If a portion of the contract is not enforceable, the "offending portions of the covenant can be lined out and still leave the remainder grammatically meaningful and thus enforceable." Solari Industries, 264 A.2d at 57 (referring to the so-called "blue pencil test"). With regard to the first factor, Ameriprise argues that it has a legitimate interest in protecting its customers' private information and that its business would suffer immeasurably if it could not protect that information. For the second factor, Ameriprise argues that no undue burden would be placed on Koenig because nothing in the FA agreement prevents Koenig from servicing his former customers at Ameriprise and that the Agreement, when read with the Protocol, only prevents Koenig from removing confidential information from Ameriprise in excess of that which is permitted under the Protocol. Finally, Ameriprise argues that the public interest would be served in protecting customers' private information. Koenig provided no argument in opposition. Thus, we find that Ameriprise has shown that the confidentiality provisions in the FA Agreement, with regard to the "excess information" is enforceable.

961 F.Supp. 721, 730 (D.N.J. 1997); <u>Rycoline Prods., Inc. v.</u>
<u>Walsh</u>, 334 N.J.Super. 62, 71, 756 A.2d 1047, 1052 (App.Div.
2000).   The party who asserts the trade secret bears the burden
of proving that the information is a secret and not a matter of
general knowledge in the industry.   <u>Rohm & Haas Co. v. Adco Chem.</u>
<u>Co.</u>, 689 F.2d 424, 431 (3d Cir. 1982).   The New Jersey Supreme
Court has relied upon the Third Circuit's reference to the
Restatement of Torts, which states:

> A trade secret may consist of any formula, pattern,
> device or compilation of information which is used in
> one's business, and which gives him an opportunity to
> obtain an advantage over competitors who do not know or
> use it. It may be a formula for a chemical compound, a
> process of manufacturing, treating or preserving
> materials, a pattern for a machine or other device, or
> a list of customers.

<u>Hammock by Hammock v. Hoffmann-LaRoche, Inc.</u>, 142 N.J. 356, 384,
662 A.2d 546 (1995) (citing <u>Smith v. BIC Corp.</u>, 869 F.2d 194, 199
(3d Cir. 1989) quoting <u>Restatement of Torts</u>, § 757, comment b
(1939)).

        The New Jersey Supreme Court has noted six
supplementary considerations given in the Restatement for
determination of whether a trade secret exists:

> (1) the extent to which the information is known
> outside the business; (2) the extent to which it is
> known by employees and others involved in the business;
> (3) the extent of measures taken by the owner to guard
> secrecy of the information; (4) the value of the
> information to the business and to its competitors; (5)
> the amount of effort or money expended on developing
> the information; and (6) the ease of difficulty with
> which the information could be properly acquired or

duplicated by others.

Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 637, 542 A.2d 879, 893 (1988) (quoting Restatement of Torts, § 757 comment b).

We are convinced that the confidential information regarding customers which Koenig removed or improperly kept constitute, or at least may contain, trade secrets under New Jersey law.  For example, what strategies and techniques Ameriprise employs in devising its financial plans may well qualify.  In any event, Koenig admitted that such client information amounts to a trade secret when he signed the FA Agreement.  It is also fair to say that we have already found on the breach of contract claim that such disclosure breached a confidence created by contract of which Koenig was aware.  What Ameriprise has not done, however, is provide in sufficient measure facts establishing the harm caused by the breach. Although the facts and timing of Koenig's blast of e-mails suggest he sought a competitive advantage to the detriment of Ameriprise, the extent of the resulting harm is unclear from the existing record.  We need not resolve this issue, however, having already concluded that plaintiff will likely prevail on it breach of contract claim.

**(2)  Irreparable Harm**

Ameriprise argues that it will suffer irreparable harm because without injunctive relief it will be unable to affect the

16

return of its information.  Ameriprise argues that if customers found out that it failed to keep their information confidential it would result in significant loss of customer trust and goodwill.

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992) (citations omitted).  "The preliminary injunction must be the only way of protecting the plaintiff from harm." Id. (emphasis and internal citations omitted).  A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." Id. (citing ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).

Many courts have found that injunctive relief is the appropriate remedy due to disclosure of trade secrets. See Bimbo Bakeries, 613 F.3d at 113-14 (upholding district court's injunction against defendant from working at competitor to the extent his employment threatened to lead to misappropriation of trade secrets); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran, 67 F.Supp.2d 764, 779 (E.D.Mich. 1999) (granting injunctive relief because "[t]here is simply no way of predicting (1) how clients' portfolios might have grown if not transferred away from Merrill Lynch, (2) what assets existing clients may earn, inherit, or even win over time, nor (3) what potential referrals

transferring clients might have made.  The goodwill of Merrill Lynch is an invaluable intangible which...is not easily quantified."); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer, 816 F.Supp. 1242, 1247 (N.D. Ohio 1992) (finding irreparable harm where Merrill Lynch clients, upon discovering that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, lose trust and confidence in Merrill Lynch).

Koenig argues that Ameriprise cannot show irreparable harm based on case law following the adoption of the Protocol. After adoption of the Protocol, courts have taken the position that signatories to the Protocol recognize the "fluid nature of the industry" in which "brokers routinely switch firms and take their client lists with them" so that "[b]y setting up such a procedure for departing brokers to take client lists, [Protocol signatories] tacitly accept[] that such an occurrence does not cause irreparable harm."  Barney v. Burrow, 558 F.Supp.2d 1066, 1083 (E.D.Cal. 2008) (citing Merrill Lynch v. Brennan, 2007 WL 632904, at *2 (N.D.Oh. 2007)).

Ameriprise is a signatory to the Protocol and, therefore, presumably accepts the "fluid nature of the industry." Ameriprise is seeking, however, only a limited injunction, namely, return of confidential information taken in excess of what is permitted under the Protocol.  Ameriprise has shown that

disclosure of its confidential information could put it at a
competitive disadvantage and result in loss of customer trust and
goodwill which may not be quantifiable at the conclusion of the
litigation.  The fact that the Protocol does not permit
disclosure of such information suggests that it is to remain
highly protected.  Koenig provides no argument in opposition.
Therefore, Ameriprise has shown that absent injunctive relief it
cannot affect the return of its confidential information taken in
excess of that allowed under the Protocol and as a result would
suffer irreparable harm.

### (3)  Harm to Non-Moving Party

Ameriprise argues that Koenig will suffer no harm if
injunctive relief is granted because the parties will be returned
to the status quo that existed before Koenig violated the FA
Agreement.  Ameriprise states that Koenig may continue to compete
with Ameriprise while employed by IFP and may service customers
he formerly serviced while employed with Ameriprise.  Ameriprise
also states that Koenig can use certain Ameriprise client
information for IFP's benefit but he cannot use information in
excess of that which is permitted by the Protocol.  In essence,
Ameriprise is arguing that even though Koenig violated the
Protocol he would be still be allowed to engage in activities
permitted under the Protocol, just not using any "excess
information."

Koenig argues that because Ameriprise did not accept the Protocol spreadsheet at the time of his attempted resignation Ameriprise cannot hold him to the restrictive covenants in the FA Agreement.  Koenig states that Ameriprise's argument that he "can use Ameriprise client information for the benefit of his new employer" is patently false and untruthful.

Koenig's argument misses the mark since Ameriprise is not seeking to hold him solely to the restrictive covenants in the FA Agreement.  Rather, Ameriprise has stated that the FA Agreement should be applied along with the Protocol so that Koenig is permitted to continue his employment with IFP, and engage in the activities permitted by the Protocol such as servicing clients he formerly serviced while employed at Ameriprise and use of certain client information for IFP's benefit despite Koenig's breach.

We conclude that Koenig will not be harmed by engaging in those activities permitted under the Protocol using only the information permitted under the Protocol.  Koenig is, however, prohibited from using the "excess information" taken in violation of the Protocol and FA Agreement.  Thus, Ameriprise has shown that Koenig will not suffer harm if the injunctive relief is awarded since he retains the protections afforded in the Protocol.

20

### (4)  Public Interest

Ameriprise argues that its customers provide it with sensitive personal information and expect that information to be kept confidential and that the public interest is served by keeping it confidential.  There can be little disagreement that it is in the public interest to keep an individual's private and personal information confidential.  See Fisher Bioservices, Inc. v. Bilcare, Inc., No. 06-567, 2006 WL 1517382, at *21 (E.D.Pa. May 31, 2006) ("Granting equitable relief such as a preliminary injunction may serve the public interest if it will 'discourage ... the wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations.'") (citing National Business Services, Inc. v. Wright, 2 F.Supp.2d 701 (E.D.Pa. 1998)).

Therefore, Ameriprise has shown that injunctive relief favors the public interest.[9]

---

[9]     Koenig also summarily lists five arguments for denying Ameriprise's motion for injunctive relief.  Namely,(1) Ameriprise did not include a table of contents or table of authorities as required by L.Civ.R. 7.2(b); (2) Ameriprise provided insufficient notice pursuant to Fed.R.Civ. 65; (3) Ameriprise did not file a corporate disclosure statement as required by Fed.R.Civ.P. 7.1; (4) Ameriprise failed to file a civil cover sheet; and (5) failed to make the required redactions pursuant to Fed.R.Civ.P. 5.2. Koenig is correct that Ameriprise failed to follow L.Civ.R. 7.2(b) and failed to use the proper cover sheet.  The Court in its discretion will overlook the procedural irregularities in deciding the merits of this case but will instruct Ameriprise that, in the future, it is required to follow all Federal and local civil rules and failure to do so may warrant sanctions, including dismissal of claims.  With regard to insufficient

### Koenig's "Cross Motion" for Summary Judgment

Koenig filed a "cross motion" for summary judgment arguing that judgment should be granted in his favor because Ameriprise admitted that Koenig did not wrongfully remove Ameriprise property.  Koenig's "cross motion" will be denied.

### Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)(quoting Fed. R. Civ. P. 56©)).

An issue is "genuine" if it is supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute

---

notice under Rule 65, the defendant was provided time to file a written response (albeit only one day) and agreed to the date and time for the TRO hearing.  A corporate disclosure statement was filed by Ameriprise on October 18, 2011.  The failure to redact certain private information was rectified by the filing of a motion to seal which was granted on November 17, 2011.   Thus, the Court will not deny the motion for TRO on any of these grounds.

about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

**Admission by Ameriprise**

Koenig states that on September 19, 2011, after having sent him a letter accusing him of removing proprietary information and using it to solicit clients, Ameriprise filed a "Uniform Termination Notice for Securities Industry Registration" or "U-5" Form with the Financial Industry Regulatory Authority ("FINRA") responding "no" to a question on the form asking whether Koenig was currently under internal review for fraud or wrongful taking of property.  The U-5 form was verified by Alanna Proctor, an Ameriprise employee responsible for compliance, licensing and registration at Ameriprise.

Ameriprise responds that the Form U-5 filed on September 19, 2011 was filed before any legal action was taken against Koenig and before Ameriprise had completed its forensic examination of its email system.  The complaint in this matter was filed on October 18, 2011.  Karen L. Odash's affidavit states that it was not until October 26, 2011, that she accessed

23

Koenig's email and found that he had forwarded client financial information to his personal email address.

It appears that Ameriprise suspected that Koenig had removed client meeting information from its database before it filed the Form U-5. Ameriprise certainly wrote to Koenig five days before the form was filed accusing him of accessing and removing "Ameriprise proprietary, corporate, and confidential information." Yet, Ameriprise answered "no" to the question on the U-5 form asking whether the terminated employee "[c]urrently is, or at termination was, under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct."

Although this statement would likely qualify as an admission by a party opponent under Fed.R.Evid. 801(d)(2),[10] it seems to be inaccurate since Ameriprise did suspect Koenig of wrongdoing prior to September 19, 2011. Whether this was a mis-communication within Ameriprise's offices, or a clerical error,

_____

[10]   A statement is not considered hearsay if it is offered against an opposing party and:
        (A) was made by the party in an individual or representative capacity;
        (B) is one the party manifested that it adopted or believed to be true;
        (C) was made by a person whom the party authorized to make a statement on the subject;
        (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
        (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Ameriprise does not say.[11]   However, Ameriprise did not file its
complaint until October 18, 2011, a month <u>after</u> the U-5 form was
filed alleging that Koenig engaged in behavior in violation of
the Protocol and FA Agreement.  Also, Ameriprise has provided
clear evidence that Koenig forwarded confidential information to
his private email and called clients to reschedule appointments
for a time after he left Ameriprise, which facts were not
uncovered until after the filing of the U-5 form.

        Thus, based on the uncontroverted evidence that Koenig
violated the Protocol and FA Agreement, Koenig's "cross motion"
for summary judgment will be denied.[12]

### IV.  <u>CONCLUSION</u>

        For the foregoing reasons, Ameriprise's motion will be
granted in part and denied in part.[13]   Subject to the restrictions

---

[11]    The Court makes no decision whether Ameriprise is
responsible for correcting the U-5 Form.

[12]    Koenig also argues that any damages stemming from
Koenig's retention of confidential information is due to the
actions of Salvatore Petetti, Ameriprise's agency manager, who
refused to accept the Protocol spreadsheet at the time that
Koenig attempted to resign.  This issue has been addressed in
footnote 7, <u>supra</u>.

[13]    Plaintiff also seek a forensic examination of
defendant's "professional and personal" computers to insure that
all confidential materials are identified, destroyed, returned,
or otherwise disposed of.  While the Court is inclined to grant
such relief, it is unclear whether such relief will be sought or
is even available in the forthcoming administrative proceedings.
Plaintiff is directed to inform the Court by letter within ten
days of the entry of this Opinion and Order as to whether it
continues to seek such relief in this Court.  If so, the Court
will promptly schedule a hearing to determine the proper scope of

explained herein, Ameriprise will be granted an injunction with regard to its breach of contract claim.  Koenig, and any person or entity acting in concert with him, shall delete from his current files all confidential client information removed from Ameriprise in excess of the information permitted under the Protocol, and, where necessary to insure full compliance with the accompanying order of this Court, return such information to Ameriprise.  Koenig's cross motion for summary judgment will be denied.[14]


Dated: February 6, 2012

s/Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.


At Camden, New Jersey

_____

such relief.

[14] In his motion, Koenig also asks the Court to take notice of an email that counsel for Ameriprise, Michael Brittan, Esq., sent to FINRA on October 27, 2011, stating that he was enclosing a copy of an order of this Court "granting injunctive relief to Ameriprise" as Exhibit E.  No order granting injunctive relief was entered by this Court on or prior to October 27, 2011.  Decision on the motion was reserved until after the deposition of Koenig.  The affidavit submitted by Brittan attaches a copy of his email, but not a copy of the "order" that Brittan incorrectly states was entered by this Court.  Not only does Brittan provide no explanation for his misrepresentation, he provides no evidence that his misrepresentation was ever corrected.  The misrepresentation by an attorney of an Order of this Court is a very serious issue.  The Court will order Mr. Brittan to provide a copy of what was attached as "Exhibit E" and purported to be the order granting the injunction.  Mr. Brittan will also write to FINRA stating his misrepresentation and providing the correct facts.  If Brittan fails to do so within three (3) days of the entry of the Court's order, the Court shall hold a hearing to determine an appropriate remedy.